UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN TRANSIT INSURANCE COMPANY,<br><br>                       **Plaintiff,**<br><br>      -against-<br><br>MEDMART OF NY CORP, ROYAL REHAB INC, GIKOR SONAYAN a/k/a GEORGE SMITH, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                       **Defendants.** | CIVIL ACTION<br><br>22-CV-6581<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

Plaintiff American Transit Insurance Company (the "**Plaintiff**" or "**American Transit**"), by their attorneys, Morrison Mahoney, LLP, for their Complaint against Gikor Sonayan a/k/a George Smith ("Sonayan"), MedMart of NY Corp ("MedMart of NY"), Royal Rehab Inc ("Royal Rehab") (MedMart of NY and Royal Rehab are collectively referred to as "**Retailers**," Sonayan and Retailers are collectively referred to as "**Retailer Defendants**"), John Does 1 through 5, (collectively "**Wholesale Owners**"), and ABC Corporations 1 through 5 (collectively "**Wholesalers**"; Wholesalers and Wholesale Owners are collectively referred to as "**Wholesale Defendants**"), (collectively the Retail Defendants and Wholesale Defendants are referred to herein as "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.    From at least April 2013 and continuing through the date of the filing of this Complaint, Defendants engaged in separate, but fundamentally similar schemes to defraud automobile insurance companies, including Plaintiff, through New York State's No-fault system.

2.    This action seeks to recover more than $121,200.00 that Defendants stole from Plaintiff through the submission of hundreds of false and/or fraudulent insurance claims for durable medical equipment ("DME") and/or orthotic devices. As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their homes,

including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses and whirlpools; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes.  Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.      At all relevant times mentioned herein, each and every DME and/or orthotic device supplied by the Retailers was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.      To execute the scheme to defraud alleged herein, Sonayan, through the Retailers, entered into separate arrangements with one or more of the Wholesale Defendants, and one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.      Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

(i)     ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Retailers;

    (ii)    fabricating and/or falsifying DME prescriptions by:

        a.    utilizing blank prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME and/or orthotic devices;

        b.    fraudulently altering otherwise valid prescriptions issued by their HCPs by adding or changing the DME and/or orthotic device(s) prescribed in order to conform the prescription to a pre-determined protocol designed to maximize reimbursement by insurance companies;

    (iii)    ensuring that the prescriptions were sufficiently generic so that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

6.    The use of generic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the DME and/or orthotic devices prescribed to the patient, if any items were legitimately prescribed at all; (ii) misrepresent the nature and quality of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiff, in particular.

7.    Pursuant to the fraudulent prescriptions, the Retailers routinely provided (or purported to provide) a nearly identical battery of DME and/or orthotic devices to persons injured in automobile accidents insured by Plaintiff (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiff in particular.

8.    On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.    In many instances, Sonayan submitted to Plaintiff, through the Retailers, prescription forms which they knew to be fabricated and/or fraudulently altered, in order to

misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.     On information and belief, pursuant, pursuant to similar agreements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, the Wholesale Defendants provided one or more of the Retailers with inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices. Other times, the Wholesale Defendants provided the Retailers with fraudulent wholesale invoices that reflected DME and/or orthotic devices that were never actually provided to Retailers.  In fact, irrespective of whether any DME and/or orthotic devices were actually provided to Retailers, the wholesale invoices typically reflected prices that exceeded 10 times the actual prices that the Retailers paid to the Wholesale Defendants and/or were sufficiently generic and devoid of detail to allow the Retailers to seek reimbursement for expensive, complex DME when simple and/or counterfeit DME was provided.

11.     On information and belief, in some instances, to create the illusion that the Retailers paid the grossly inflated prices on the wholesale invoices, as more fully alleged in the "Money Laundering Scheme" section below, one or more of the Retailers issued checks to the Wholesale Defendants for the full amounts reflected on the wholesale invoices. The Retailers then used those checks to demonstrate to Plaintiff, and others, that they had paid the false wholesale invoice amounts. In reality, the Wholesale Defendants converted the checks they received from the Retailers to cash and secretly returned to the Retailers a portion of the profits of the scheme through kickbacks or other financial compensation. These covert cash transactions were facilitated through

various clandestine arrangements among the Retailers, the Wholesale Defendants, check brokers, check cashers and/or others unknown to Plaintiff.

12.     On information and belief, through these transactions, the Retailers were able to surreptitiously obtain cash, which then was used for, among other things, kickbacks to the No-fault Clinics from which the Retailers received fraudulent prescriptions for DME and/or orthotic devices.

13.     In other instances, Sonayan, through the Retailers, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, the Retailers knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items and bill for such items under expensive codes for complex DME when, in fact, the items were cheaply manufactured.

14.     In furtherance of the scheme to defraud alleged herein, the Retailers purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality, and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

15.     After obtaining the fraudulent prescriptions from the No-fault Clinics and the inflated invoices from the Wholesale Defendants and/or counterfeit DME from the non-party wholesalers and suppliers, Sonayan, through the Retailers, generated and submitted bills to Plaintiff, among others, knowingly misrepresenting the actual amounts they paid for the DME and/or orthotic devices, as well as the nature and quality of the items, and the medical necessity of the purportedly prescribed DME and/or orthotics.

16.     In order to prevent Plaintiff from determining the appropriate charges associated with any such DME and/or orthotic device, or whether the specific DME and/or orthotic device billed for was medically necessary, the documents submitted to Plaintiff by Sonayan through the Retailers in support of their fraudulent claims, including the wholesale invoices, deliberately omitted and/or misrepresented basic information about the DME and/or orthotic devices, including, but not limited to, the manufacturer, make, model, size, features and/or functions of the item and/or included information that was meaningless in determining the kind and quality of any specific DME and/or orthotic device.

17.     On information and belief, Sonayan, through the Retailers, routinely purchased basic, low-quality, and inexpensive items from the Wholesale Defendants or other suppliers, but submitted documents, including, but not limited to, in some instances, inflated wholesale invoices, to insurers, including Plaintiff, that failed to accurately reflect the actual nature, quality, and purchase price of each item.

18.     In support of their claims for reimbursement, and to facilitate the fraud described herein, Sonayan, through the Retailers, generated delivery receipts that included a space for the patient's signature to document receipt of each item for which Sonayan, through the Retailers, billed Plaintiff.

19.     On information and belief, often pursuant to the agreements between the Retailer Defendants and the No-fault Clinics, patients were directed to sign these delivery receipts upon presenting to the No-fault Clinics, irrespective of whether any DME and/or orthotic devices were provided to the patient at that time. The Retailer Defendants then submitted to Plaintiff the signed delivery receipts as purported evidence of DME and/or orthotic devices allegedly supplied to a patient, when, in fact, no DME or orthotic device was ever supplied to the patient.

20.     At all relevant times mentioned herein, Defendants collectively utilized a common fraudulent blueprint as a business plan, sharing common documentation, using the same fraudulent billing codes, using prescriptions from the same No-fault Clinics, with the same battery of DME prescribed to nearly every patient, making the same misrepresentations, and engaging in virtually identical patterns of fraud that were not the product of happenstance, but instead evidence of related and parallel fraudulent billing schemes that trace back to a common genesis and framework.

21.     In order to execute the same fraudulent blueprint, at all relevant times mentioned herein, Sonayan, through the Retailers, engaged in one or more of the following actions: (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of DME and/or orthotic devices; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiff, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered; (iv) paying fees to one or more Wholesale Defendants in exchange for fraudulent wholesale invoices that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; (v) arranging for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by Covered Persons to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiff, in particular, and (vi) systematically submitting bills to insurers, in general, and Plaintiff, in particular, for DME and/or orthotic devices that Sonayan, through the Retailers, determined should be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar DME and/or orthotic devices.

22.     At all relevant times mentioned herein, Sonayan, through the Retailers, engaged in a fraudulent billing scheme involving the same or similar material misrepresentations and/or

omitted material statements in No-fault claims submitted to Plaintiff for payment. In that regard, each and every bill and supporting documentation submitted by the Retailers contained the same or similar false representations of material facts, including, but not limited to one or more of the following: (i) false and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to Covered Persons; (ii) false and misleading statements as to the amounts the Retailers were entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the  Covered Persons; (iv) false and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to  Covered Persons, which generically described the item(s) in order to conceal the nature, type, and quality of item(s) being prescribed and/or provided; (v) fabricated, false and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the DME and/or orthotic devices either were not prescribed as alleged, or were prescribed and supplied pursuant to a pre-determined, fraudulent protocol, whereby the Retailers paid kickbacks to No-fault Clinics to induce the No-fault Clinics to provide fraudulent and fabricated prescriptions for large amounts of substantially similar, medically unnecessary DME and/or orthotic devices. All of foregoing was intended to manipulate the payment formulas under the No-fault Law in order to maximize the charges that the Retailers could submit to Plaintiff and other insurers under the No-fault Law.

23.     In furtherance of the schemes to defraud alleged herein, Defendants undertook identifiable fraudulent actions pursuant to a common multiple part blueprint under the same reimbursement system billing for the same DME, following the same billing protocol, using the same billing codes, and making the same multiple misrepresentations.

24.     In carrying out the scheme to defraud, Defendants stole in excess of $121,200.00 from Plaintiff by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

### STATUTORY/REGULATORY SCHEME

25.     Pursuant to the No-fault Law, Plaintiff is required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

26.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiff for DME and/or orthotic devices that were never provided, not provided as billed or, if provided, were of inferior quality relative to what was represented to have been provided in the bills submitted to Plaintiff, and/or were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME and/or orthotic devices.  Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiff to the Retailers for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

27.     The Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for their services, the Retailers accepted (and continue to accept) assignments of benefits from Covered Persons and submitted (and continue to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

28.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq.*, the Retailers submitted (and continue to submit) bills for their claims to Plaintiff using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form.

29.      At all relevant claims mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiff by the Retailers contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

30.     At all relevant times mentioned herein, Retailer Defendants identified the DME and/or orthotic devices it purported provided to Covered persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia* durable medical equipment and orthotic devices.

31.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff was (and is) required to promptly process claims within 30 days of receipt of proof of claim.

32.     At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

33.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

34.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

35.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-

authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

36.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq.*), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances (hereinafter the "Fee Schedule").

37.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, in accordance with Medicaid rules, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

38.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Medicaid DME Fee Schedule"), 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021), which lists such devices by corresponding HCPCS Level II Code.

39.     In view of the adoption by the WCB of the Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Medicaid DME Fee Schedule that was, in effect at all relevant times mentioned herein prior to April 4, 2022.

40.     Accordingly, at all relevant times mentioned herein, for DME and/or orthotic devices provided prior to April 4, 2022, providers of DME are entitled to reimbursement in the amounts set forth in the Medicaid DME Fee Schedule.  At all relevant times mentioned herein, for DME and/or orthotic devices provided prior to April 4, 2022, for Non-Medicaid DME Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2011) (sometimes referred to herein as the "Lesser of Standard").

41.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Medicaid DME Fee Schedule remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard, on April 4, 2022. New York Workers' Compensation Board Bulletin Nos. 046-1408 (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp), 046-1496 (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

42.     In relevant part, for DME and/or orthotic devices provided on or after April 4, 2022, the WCB established its own fee schedule for DME and orthotic devices to replace its prior

adoption of the Medicaid DME Fee Schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances. (hereinafter "WCB DME Fee Schedule") *See* 12 N.Y.C.R.R. § 442.2(a) (WCB DME Fee Schedule and Medicaid DME Fee Schedule are collectively referred to as the "Fee Schedule").

43.    Like the Medicaid DME Fee Schedule, the WCB DME Fee Schedule listed DME and orthotic devices by their corresponding HCPCS Level II Codes.

44.    As part of the WCB's amendments to the Medicaid DME Fee Schedule, the available DME on the WCB DME Fee Schedule was updated, the reimbursement rates were increased, and a prior authorization process was established for certain DME in the WCB DME Fee Schedule for which no reimbursement rate is listed and/or for DME not listed in the WCB DME Fee Schedule.  As a result of these amendments, the WCB eliminated the prior Lesser of Standard that had existed for Non-WCB DME Fee Schedule items.

45.    In the event that a DME item was not listed in the WCB DME Fee Schedule, the WCB adopted a prior authorization requirement through which a DME provider must obtain prior authorization, including for a proposed purchase price or rental rate for the equipment, before supplying the rented DME. 12 N.Y.C.R.R. § 442.2(b)(1)(2).

46.    Except as rendered inapplicable to reimbursement of No-fault claims by Regulation 83, the WCB DME Fee Schedule applies to the reimbursement of items listed in the WCB DME Fee Schedule.

47.    Pursuant to Regulation 83, the requirements of prior authorization under the WCB DME Fee Schedule does not apply to the reimbursement of claims under the No-fault law.

48.    The Department of Financial Services recognized that the WCB's elimination of the Lesser of Standard for reimbursement of items not listed on the WCB DME Fee Schedule

creates a system, in the context of reimbursement under the No-fault law, for fraud and abuse, with no cost-containment systems in place and the possibility for nefarious DME providers to bill for DME at exorbitant, unchecked rates.

49.     To address the potential for fraud and abuse, by emergency adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, the DFS reinstated the Lesser of Standard for reimbursement of DME under the No-fault law, limiting the maximum purchase for Non-WCB DME Fee Schedule items as follows:

**Part E. Durable medical equipment fee schedule**.

(a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee has been assigned.

(b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.

(c) The maximum permissible purchase charge…for such durable medical equipment shall be the lesser of the:

(1) acquisition cost plus 50%; or

(2) usual and customary price charged by durable medical equipment providers to the general public.

50.     By Emergency Adoption dated June 30, 2022, DFS extended its reinstatement of the Lesser of Standard for reimbursement of DME under the No-fault law for an additional 90 days. https://www.dfs.ny.gov/system/files/documents/2022/06/re83_amend36_text_20220630.pdf

51.     At all times relevant times mentioned herein from April 4, 2022 through the present, with respect to DME items that are not listed on the WCB DME Fee Schedule and/or listed on the WCB DME Fee Schedule but for which no fee has been assigned (hereinafter "Non-WCB DME Fee Schedule" items) (Non-WCB DME Fee Schedule items and Non-Medicaid DME Fee

Schedule items collectively referred to as "Non-Fee Schedule" items), the Lesser of Standard as reflected in the Emergency Adoption to Regulation 83 dated April 4, 2022 and thereafter extended by Emergency Adoption dated June 30, 2022 caps the maximum amount providers can be reimbursed under the No-fault Law.

52.     At all relevant times mentioned herein from April 4, 2022 through the present, a provider's acquisition cost is "the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax. 11 N.Y.C.R.R. § App.17-C Part E(b) (promulgated by April 4, 2022 and June 30, 2022 Notices of Emergency Adoption).

53.     At all relevant times herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

54.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

55.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiff by Sonayan, through the Retailers, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME and/or orthotic devices.  To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which the proper reimbursement amount, if reimbursable at all, was a mere fraction of the amount they charged Plaintiff, and/or was

16

medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

56.     At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive and identical billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiff, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule ("Fee Schedule items" and "Non-Fee Schedule items," respectively) purportedly provided to Covered Persons.

57.     As set forth in the "Fee Schedule Scheme to Defraud" section below, Sonayan, through the Retailers, routinely submitted fraudulent bills to Plaintiff for DME and/or orthotic devices that were never provided, including, but not limited to, expensive custom-fit DME and/or orthotic devices.

58.     On information and belief, the Retailers and Wholesalers alike were created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

59.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any DME and/or orthotic devices at all, provided No-fault Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

60.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud— although that would be troubling enough—rather, they adopted identical fraudulent blueprints as

their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for DME and/or orthotic devices pursuant to a predetermined course of treatment, to obtaining inflated wholesale invoices for inexpensive, low quality items, to generating bills that contained codes not recognized under the Fee Schedule in existence at the time, or that misrepresented the nature, quality, and cost of DME and/or orthotic devices purportedly provided, was carried out for the purpose of committing fraud.

61.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices.  In doing so, Plaintiff seeks compensatory damages and declaratory relief that Plaintiff is not required to pay any of the Retail Defendants' No-fault claims because Sonayan, through the Retailers, submitted (1) false and fraudulent insurance claims to Plaintiff deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiff for DME and/or orthotic devices the Retail Defendants never actually supplied to No-fault Covered Persons.  Such claims continue to be submitted by and/or in the name of the Retailers and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiff.

62.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $198,100.00 in unpaid No-fault claims that form the basis of Plaintiff's request for declaratory relief.  Said spreadsheet is grouped by claim number, Retailer, date of service and the amount billed.

## **NATURE OF THE ACTION**

63.     This action is brought pursuant to:

     i)      The United States Racketeer Influenced and Corrupt Organizations

             Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

     ii)     New York State common law; and

     iii)   the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## **NATURE OF RELIEF SOUGHT**

64.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff seeks treble damages, which they sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiff for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiff under New York State's No-fault Law.

65.     Plaintiff further seeks a judgment declaring that they are under no obligation to pay any of the Retailers' unpaid No-fault claims because:

     i)    The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiff; and

     ii)   The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME and/or orthotic devices that they never supplied to No-fault Covered Persons.

66.     As a result of Defendants' actions alleged herein, Plaintiff was defrauded of an amount in excess of $121,200.00 the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiff for DME and/or orthotic devices that were

never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

### A.  Plaintiff

67.    Plaintiff American Transit Insurance Company is a corporation duly organized and existing under the laws of the State of New York, having its principal place of business in Brooklyn, New York.

68.    Plaintiff is duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provides automobile insurance coverage to its policyholders under and in accordance with New York State law.

### B.  The Retail Defendants

69.    Gikor Sonayan a/k/a/ George Smith ("Sonayan") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailers MedMart of NY Corp and Royal Rehab Inc and, at all times relevant herein, operated, managed, and/or controlled their activities.

70.    MedMart of NY Corp ("MedMart of NY") was incorporated on or about October 9, 2013, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 163-03 110th Avenue, Jamaica, NY 11433.  MedMart of NY is operated, managed, and/or controlled by Defendant Sonayan and submitted fraudulent claims to Plaintiff seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

71.    Royal Rehab Inc ("Royal Rehab") was incorporated on or about April 5, 2013, and purports to be a retail DME supply company, authorized to do business in the State of New York,

with its principal place of business located at 5 Continental Avenue, # 401, Forest Hills, NY 11375. Royal Rehab is operated, managed, and/or controlled by Defendant Sonayan and submitted fraudulent claims to Plaintiff seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

**C.     The John Doe Defendants**

72.     On information and belief, John Does 1 through 5 are the principals, officers, and/or directors of the ABC Corporations 1 through 5.  John Doe Defendants 1 through 5, through the ABC Corporations 1 through 5, entered into kickback and/or other financial compensation agreements with the Retailers to provide inexpensive DME and/or orthotic devices and fraudulent wholesale invoices that enabled the Retailers to fraudulently bill Plaintiff.  These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**D.     The ABC Corporations**

73.     On information and belief, ABC Corporations 1 through 5 are additional corporations that purport to be wholesale DME supply companies that supply the Retailers with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers.  These wholesale invoices: (i) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (ii) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers can, in turn, submit the fraudulent wholesale invoices to insurers, including Plaintiff, in support of their fraudulent claims for reimbursement.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

74.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

75.     This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

76.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

77.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

78.     Plaintiff underwrites automobile insurance in New York State.

79.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiff is required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

80.     The Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for their services, the Retailers accept assignments of benefits from the Covered Persons covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

81.     To process and verify the claims submitted by the Retailers, Plaintiff required, and the Retailers submitted, prescriptions and other documents relating to the DME and/or orthotic devices allegedly supplied to No-fault Covered Persons for which the Retailers were seeking reimbursement from Plaintiff.

82.     In nearly all instances, the prescriptions submitted in support of the Retailers' claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

83.     In certain instances, one or more of the Retailer Defendants also submitted wholesale invoices to Plaintiff in support of their claims for reimbursement, which reflected inflated prices well in excess of what the Retailers actually paid, if anything, for the DME and/or orthotic devices purportedly purchased from the Wholesaler.

84.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff is required to promptly process the Retailers' claims within 30 days of receipt of proof of claim.

85.     To fulfill their obligation to promptly process claims, Plaintiff justifiably relied upon the bills and documentation submitted by the Retailers in support of their claims, and paid the Retailers based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiff.

86.     At all relevant times mentioned herein, the No-fault law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

87. At all relevant times mentioned herein, for DME and orthotic devices provided to Covered Persons prior to April 4, 2022, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2 (effective through June 7, 2021).

88. At all relevant times mentioned herein prior to April 4, 2022, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

    (1)    the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

    (2)    the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2(effective through June 7, 2021).

89. On April 4, 2022, the WCB's amendments to the fee schedule by the WCB took effect, including the establishment of the WCB DME Fee Schedule. As part of the WCB's amendments to the WCB DME Fee Schedule, the available DME on the WCB DME Fee Schedule was updated, the reimbursement rates were increased, and a prior authorization process was established for certain DME in the WCB DME Fee Schedule for which no reimbursement rate is listed and/or for DME not listed in the WCB DME Fee Schedule.  As a result of these amendments, the WCB eliminated the prior Lesser of Standard that had existed for Non-Fee Schedule items.

90. Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided on or after April 4, 2022, the Worker's Compensation Board has adopted its own fee schedule for DME and orthotic devices to replace its prior adoption of the fee schedule set by the New York State Medicaid Program. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

91.     In the event that a DME item was not listed in the WCB DME Fee Schedule, the WCB adopted a prior authorization requirement through which a DME provider must obtain prior authorization, including for a proposed purchase price or rental rate for the equipment, before supplying the rented DME. 12 N.Y.C.R.R. § 442.2(b)(1)(2).

92.     In view of the WCB's elimination of the Lesser of Standard, resulting in the absence of a cost control measure for Non-WCB DME Fee Schedule items and the potential for exorbitant prices and unlimited rental charges that could far exceed the purchase price of the DME, the DFS Superintendent deemed it necessary to adopt an emergency amendment to 11 N.Y.C.R.R. § 68 (Regulation 83) to cap the purchase and total accumulated rental prices for Non-WCB Fee Schedule items.

93.     Accordingly, at all relevant times mentioned herein on or after April 4, 2022, for Non-WCB Fee Schedule DME, the fee payable shall be: "[t]he maximum permissible purchase charge … for such durable medical equipment shall be the lesser of the: (1) acquisition cost plus 50%; or (2) usual and customary price charged by durable medical equipment providers to the general public." 11 N.Y.C.R.R. § App.17-C Part E (c) (promulgated by April 4, 2022 and June 30, 2022 Notices of Emergency Adoption). As used in the regulation, "*acquisition cost* means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax." 11 N.Y.C.R.R. § App.17-C Part E (b) (promulgated by April 4, 2022 and June 30, 2022 Notices of Emergency Adoption).

94.     The Retailers were created as the centerpieces of elaborate schemes to fraudulently bill No-fault insurance carriers for DME and/or orthotic devices that were never provided, were not provided as billed or, if provided, were either of inferior quality relative to what was included

in the bills submitted to Plaintiff, and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all No-fault Covered Persons received the same or similar battery of DME and/or orthotic devices.

95.    The DME and/or orthotic devices that the Retailers purported to provide, and for which they billed Plaintiff, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, Sonayan, through the Retailers, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

96.    Sonayan created and controlled the Retailers, which were part of separate, but substantially similar well-organized illegal enterprises that engaged in fundamentally similar, systematic, and pervasive fraudulent practices that distinguished them from legitimate providers of DME and/or orthotic devices.  The components of each enterprise followed practices that were part of a racketeering scheme dictated by Sonayan, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, misrepresented the nature, quality, and cost of DME and/or orthotic devices purportedly provided to No-fault Covered Persons;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, submitted bills to Plaintiff misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, submitted bills to Plaintiff for DME and/or orthotic devices that were never provided to No-fault Covered Persons;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, submitted wholesale invoices to Plaintiff as part of their proof of claim, which systematically failed to provide a meaningful description of the DME and/or orthotic devices purportedly provided (*i.e.*, make and model) and/or additional information that is necessary to determine whether the charges submitted are legitimate;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, submitted wholesale invoices to Plaintiff containing generic item descriptions, concealing the manufacturer, make, model, size, and quality of the DME and/or orthotic devices purportedly supplied;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, submitted bills to Plaintiff reflecting prices far in excess of those actually paid, concealing that the items actually supplied were far less expensive than the amounts indicated in the wholesale invoice for any particular item;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, submitted prescriptions, bills, and delivery receipts to Plaintiff for DME and/or orthotic devices that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, concealed the fact that the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were fabricated and/or fraudulently altered in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, arranged for the generic language on the prescription forms in order to unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and American Transit in particular;

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, arranged to have prescriptions for DME and/or orthotic devices delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers;

- Unlike legitimate retail DME companies, the Retailers claimed to conduct their daily operations from locations that in many cases had no signage or that were shuttered with no indication that any business was conducted at that location; and/or

- Unlike legitimate retail DME companies, Sonayan, through the Retailers, entered into illicit relationships with the Wholesale Defendants, which, in exchange for kickbacks and/or a fee, provided the Retailers with wholesale invoices that fraudulently inflated the price, quantity and/or item(s) provided, with the payments relating to such wholesale invoices, in many instances, actually serving as the vehicle through which Defendants laundered the money back to Sonayan through the use of check cashing establishments.

97.     In these and numerous other ways, Defendants sought to deceive Plaintiff into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

98.     The members of each enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, Sonayan engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, and/or (ii) fabricate and/or fraudulently alter prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the Retailers could unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiff in particular;

- Entered into kickback or other financial arrangements with one or more of the Wholesale Defendants so that they would provide inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices;

- Submitted or caused to be submitted, on behalf of the Retailers, numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to many Covered Persons;

- Submitted or caused to be submitted, on behalf of the Retailers, prescription forms in support of requests for payment for DME and/or orthotic devices, which they knew to be fabricated and/or fraudulently altered;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiff; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiff, knowing that they contained materially false and misleading information.

99.    By way of further example and not limitation, in furtherance of their scheme to defraud, the Wholesale Owners, through the Defendant Wholesalers:

- Entered into kickback arrangements with Sonayan, through the Retailers, to provide inexpensive DME and/or orthotic devices, coupled with wholesale invoices that grossly inflated the cost and/or quantity of the DME and/or orthotic devices reflected therein;

- Entered into kickback arrangements with Sonayan, through the Retailers, to provide wholesale invoices that were sufficiently generic so that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the item alone; and/or

- Prepared or caused to be prepared fraudulent wholesale invoices and sent them to the Retailers, knowing that the Retailers, in turn, would submit them to insurers in support of fraudulent claims for reimbursement.

100.    By way of further example, in furtherance of the scheme to defraud alleged herein, the Defendant Wholesalers:

- Provided inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices;

- Provided generic, non-descript wholesale invoices that deliberately omitted the make, model and/or manufacturer of the DME and/or orthotic devices to ensure that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the item alone;

- Provided the essential means through which Sonayan was able to submit fraudulent bills to Plaintiff for reimbursement of Non-Fee Schedule DME and/or orthotic devices under the No-fault Law;

- Knew or should have known that the inflated costs and/or quantities of the DME and/or orthotic devices reflected in the wholesale invoices they provided were materially misrepresented in the bills submitted by Sonayan, through the Retailers, to insurers;

- Knew or should have known that the generic, non-descript wholesale invoices they provided were used to materially misrepresent the nature, cost, and quality of the DME and/or orthotic devices reflected in the bills submitted by Sonayan, through the Retailers, to insurers;

- Converted the checks they received from the Retailers to cash and returned to a portion of the profits of the scheme through kickbacks or other financial compensation;

- Were oftentimes shell corporations, with no discernable, formal corporate structure or physical office space; and/or

- Claimed to conduct their daily operations from locations with no signage or that were shuttered with no indication that any business was conducted at that location.

101.    At all relevant times mentioned herein, one or more Wholesale Owners, either directly or through others acting under and pursuant to their direction, instruction, and control, caused fraudulent wholesale invoices to be provided to the Retailers, which they knew or should have known would be used by the Retailers in furtherance of the scheme to defraud alleged herein.

102.    At all relevant times mentioned herein, the fraudulent wholesale invoices issued by the Wholesale Defendants provided the essential means by which Sonayan, through the Retailers, were able to further the scheme to defraud alleged in this Complaint.

103.    At all relevant times mentioned herein, the Wholesale Owners knew or should have known that the fraudulent wholesale invoices that were provided to the Retailers through the Wholesalers would be used by the Retailers to obtain payment from insurers, in general, and Plaintiff, in particular, in connection with fraudulent claims.

30

104.    At all relevant times mentioned herein, Sonayan knew that the wholesale invoices provided by the Wholesale Defendants were fraudulent in that they misstated the price, quantity, and quality of the DME and/or orthotic devices purportedly sold to the Retailers.

105.    At all relevant times mentioned herein, Sonayan, through the Retailers, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent wholesale invoices provided by the Wholesale Defendants to Plaintiff, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

106.    At all relevant times mentioned herein, Sonayan and Wholesale Defendants, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiff, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

107.    Beginning in April 2013 and continuing until the present day, Defendants and others not named in the Complaint have engaged in systematic fraudulent billing schemes based upon the alleged provision of DME and/or orthotic devices to No-fault Covered Persons.

108.    Sonayan incorporated, owned and/or controlled the Retailers for the purpose of defrauding insurers, in general, and Plaintiff, in particular.

109.    The Retailers, through Sonayan, engaged in virtually identical and parallel schemes to defraud, wherein Sonayan: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiff, in particular, prescriptions which they knew to

be fabricated and/or fraudulently altered; (iv) obtained fraudulently inflated wholesale invoices from one or more Wholesale Defendants that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits and/or purchased counterfeit DME and/or orthotic devices from non-party wholesalers; (v) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiff, in particular; and (vi) systematically submitted bills to insurers, in general, and Plaintiff, in particular, for DME and/or orthotic devices that were purportedly provided to Covered Persons based on medical necessity when, in fact, Sonayan, through the Retailers, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving a substantially similar battery of DME and/or orthotic devices.

110.    Each DME enterprise alleged in this Complaint carried out its scheme to defraud though substantially similar means.

111.    With the DME Retailers in place, Sonayan devised and carried out fundamentally identical schemes to fraudulently bill insurers, in general, and Plaintiff, in particular, for expensive DME and/or orthotic devices that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, and further, were inexpensive items of inferior quality that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiff.

112.    Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other

financial compensation agreements with the Defendant Retailers and other purported DME and other purported DME supply companies not named in this complaint, would issue prescriptions for parts of a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary.

113.    Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

114.    As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with Defendant Retailers, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Defendant Retailers by causing their HCPs to write DME prescriptions in accordance with a pre-determined protocol.

115.    In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for DME.  Instead, these prescriptions were given directly to Defendant Retailers to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME.

116.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiff, virtually every bill submitted by Defendant Retailers deliberately obscured the medical necessity of the billed-for DME devices so as to prevent Plaintiff from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME was in fact medically necessary.

117.    Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiff well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiff's expenditures for verifying each fraudulent claim through examinations under oath,

associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and/or peer reviews.

118.    In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the DME and/or orthotic devices prescribed were not documented in the initial examination report or a follow-up examination report of the HCP at the No-fault Clinics where the Covered Persons were treated.  To the extent that any of the medical records did identify the DME and/or orthotic devices purportedly prescribed, the records did not explain the medical necessity for the DME and/or orthotic devices, did not identify or reference all of the DME and/or orthotic devices listed on the prescriptions, and in some instances, identified DME and/or orthotic devices that was not included on the prescription issued by the HCPs.  In addition, on many occasions, the prescriptions for DME and/or orthotic devices, the prescriptions purportedly issued by the HCPs were often issued on dates that the Covered Persons did not treat with the HCPs.  By way of example and not limitation:

- On February 19, 2016, Covered Person C.M.R., claim number 664887-06, was seen for an initial examination at a No-fault Clinic located at 2510 Westchester Avenue Ste. 104, Bronx, New York and the initial examination report made did not identify all of the DME and/or orthotic devices contained on the prescriptions. Notwithstanding, Royal Rehab submitted multiple bills with prescriptions purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| C.M.R. | 02/12/2016 | Cervical Traction Unit (Universal Size) | E0855 | $502.63 |
| C.M.R. | 02/19/2016 | LSO- Lumbar Support | L0631 | $806.64 |

- On March 9, 2016, Covered Person O.U., claim number 665542-03 was seen for an initial examination at the same No-fault Clinic located at 2510 Westchester Avenue Ste. 104, Bronx, New York and the initial examination report made did not identify all of the DME and/or orthotic devices contained on the prescriptions. Notwithstanding, Royal Rehab submitted a bill with a prescription purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| O.U. | 03/09/2016 | Cervical Traction Unit (Universal Size) | E0855 | $502.63 |

- On November 04, 2016, Covered Person S.B., claim number 672179-05, was seen for an initial examination at the same No-fault Clinic located at 2510 Westchester Avenue Ste. 104, Bronx, New York and the initial examination report made did not identify all of the DME and/or orthotic devices contained on the prescriptions. Notwithstanding, Royal Rehab submitted multiple bills with prescriptions purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| S.B. | 11/04/2016 | LSO- Lumbar Support | L0631 | $806.64 |
| S.B. | 11/10/2016 | Cervical Traction Unit (Universal Size) | E0855 | $502.63 |

- On May 12, 2016, Covered Person F.Z.C., claim number 666752-03, was seen for an initial examination at a No-fault Clinic located at 183-11 Hillside Avenue, Jamaica, NY, and the initial examination report made did not identify all of the DME and/or orthotic devices contained on the prescriptions. Notwithstanding, MedMart of New York submitted multiple bills with prescriptions purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| F.Z.C. | 05/07/2016 | LSO | L0637 | $844.13 |
| F.Z.C. | 05/07/2016 | Cervical Traction Equipment- Not Requiring Stand or Frame | E0855 | $502.63 |

- On September 27, 2016, Covered Person C.M.S., claim number 679040-02, was seen for a follow-up examination at a medical office located at 876 Park Avenue, New York, NY, and the examination report made did not identify any of the DME and/or orthotic devices contained on the prescription. Notwithstanding, MedMart of New York submitted a bill with a prescription purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| C.M.S. | 09/27/2017 | Knee Orthosis, Adjustable Knee Joint | L1832 | $607.55 |

119.    In furtherance of the fraudulent protocol of treatment, the specific DME and/or orthotic devices prescribed often contradicted the purported treatment plan of the HCPs.

120.    By way of example and not limitation, several Covered Persons were prescribed DME and/or orthotic devices that were designed to decrease and/or restrict the Covered Persons' mobility such as custom fitted LSO.  At the same time, the HCPs, were also prescribed physical therapy treatments designed to increase the Covered Persons' mobility. Representative claims where Covered Persons were provided with DME and/or orthotic device prescription designed to decrease mobility, while at the same time were actively receiving physical therapy treatments designed to promote mobility include: Covered Person J.R., claim number 795878-03; Covered Person M.M., claim number 1000966-04; Covered Person D.B., claim number 1033148-03; Covered Person F.C., claim number 666752-03; and Covered Person A.F., claim number 1092148-01.

121.    On information and belief, the DME and/or orthotic devices restricting the Covered Persons movement completely contravenes the physical therapy treatments that the Covered Persons were also prescribed.

122.    In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the No-fault Covered Persons directly with the prescriptions for DME and/or orthotic devices.  Instead, these prescriptions were given directly to the Retailers to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

123.    As part of the kickback and/or other financial compensation agreement with the No-fault Clinics, the No-fault Clinics routinely provided the Retailers with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces and cervical traction

units, which the Retailers then used to unilaterally determine the DME provided to Covered Persons in purported fulfillment of the generic prescriptions, in order to bill for the most expensive type of DME and/or orthotic device and maximize reimbursement from insurers, in general, and Plaintiff, in particular.

124.   By submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, the Retailers were provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly prescribed and provided to No-fault Covered Persons.

125.   Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the No-fault Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

126.   In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, claim forms, and wholesale invoices submitted by the Retailers in support of their claims for reimbursement.

127.   In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by the Retailers to Plaintiff routinely misrepresented the DME and/or orthotic devices provided.

128.   In furtherance of the scheme to defraud alleged herein, Sonayan, through the Retailers, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other

manufacturers. At all relevant times mentioned herein, the Retailers knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items.

129.    In furtherance of the scheme to defraud alleged herein, the Retailers purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality, and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

130.    In other instances, in furtherance of the scheme to defraud alleged herein, one or more of the Retailers entered into agreements with one or more of the Wholesale Defendants whereby one or more Wholesale Defendants supplied the Retailers with invoices that were used to document false, inflated, and outrageous wholesale costs, which one or more of the Retailers then submitted to insurers, in general, and Plaintiff, in particular, as part of their proof of claim.

131.    In furtherance of the scheme to defraud alleged herein, the wholesale invoices provided by one or more Wholesale Defendants to the Retailers included artificially high prices that exceeded the actual wholesale price of the DME and/or orthotic devices reflected therein.

132.    To the extent the Retailers provided any DME and/or orthotic devices to No-fault Covered Persons, the DME and/or orthotic devices were inexpensive items that were materially misrepresented in the wholesale invoices received from one or more Wholesale Defendants.

133.    The wholesale invoices provided by one or more Wholesale Defendants to the Retailers reflected grossly inflated prices, in excess of ten times the actual prices that the Retailers paid for the DME and/or orthotic devices when they were actually provided.

134.    In furtherance of the scheme to defraud alleged herein, each of the wholesale invoices provided by one or more Wholesale Defendants to the Retailers intentionally omitted the make, model, or manufacturer of the DME and/or orthotic devices reflected in the invoice, thereby

ensuring that the nature and quality of the item that was supposedly provided could not be verified based on the wholesale invoice alone.

135.    In many instances, the DME and/or orthotic devices reflected in the wholesale invoices provided by one or more Wholesale Defendants to the Retailers were never actually provided to the Retailers; rather, the Wholesale Defendants created and provided the wholesale invoices to the Retailers to create the illusion of a sale.

136.    The wholesale invoices were provided to one or more of the Retailers to camouflage the conversion of the Retailers' checks payable to one or more Wholesale Defendants, which one or more Wholesale Defendants cashed at check cashing establishments or through other means.

137.    One or more of the Retailers would issue checks to one or more Wholesale Defendants for the full amount of the inflated wholesale invoice.  One or more Wholesale Defendants would then convert the checks to cash through check cashing establishments, or by other means, and would return a substantial portion of the money to the Retailers, keeping a portion of the profits of the scheme for themselves.

138.    In furtherance of the scheme to defraud alleged herein, one or more of the Retailers requested that one or more Wholesale Defendants have their checks cashed on their corporate accounts to fraudulently demonstrate to insurers, such as Plaintiff, that they paid for the wholesale items when, in fact, they did not.

139.    In furtherance of the scheme to defraud alleged herein, one or more of the Retailers routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, delivery receipts, and wholesale invoices that materially misrepresented the nature, quality, and cost of the DME and/or orthotic devices purportedly provided to No-fault Covered Persons.

140.    The Wholesale Defendants and No-fault Clinics provided the means through which the Defendants were able to execute their scheme to defraud.

141.    In every instance, the wholesale invoices and prescriptions were provided with the knowledge that they would be submitted to insurers, in general, and Plaintiff, in particular, to obtain reimbursement under the No-fault Law in excess of the actual permissible charge for the DME and/or orthotic devices purportedly provided.

142.    In furtherance of the scheme to defraud alleged herein, the Retailers routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault Law for expensive DME and/or orthotic devices that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

143.    In many cases, the Retailers never actually provided the DME for which they billed Plaintiff.

144.    In furtherance of the scheme to defraud alleged herein, like the wholesale invoices, the Retailers' bills intentionally omitted the make, model, and manufacturer of the DME and/or orthotic devices purportedly provided to No-fault Covered Persons in order to conceal the fact that the DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

145.    In furtherance of the scheme to defraud alleged herein, upon receiving the wholesale invoices from the Wholesalers and/or other suppliers, the Retailers, as a matter of pattern and practice, generated and submitted bills to Plaintiff knowingly misrepresenting the type, quality, and cost of DME and/or orthotic devices purportedly purchased from the Wholesale Defendants and provided to Covered Persons.

146.    By way of example and not limitation, as set forth in the "Fee Schedule Scheme to Defraud" section below, Sonayan, through the Retailers, routinely submitted fraudulent bills to Plaintiff (i) in support of expensive DME and/or orthotic devices that required a customized fitting that they never performed; and/or (ii) which sought reimbursement rates under expensive fee schedule codes for DME and/or orthotic devices that the Retailer never actually provided.

147.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiff, virtually every bill submitted by the Retailers deliberately obscured all identifying information relating to the billed-for DME and/or orthotic devices to prevent Plaintiff from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device was medically necessary.

148.    In furtherance of the scheme to defraud alleged herein, Sonayan, through the Retailers, routinely submitted fraudulent bills in support of expensive DME and/or orthotic devices that required a custom fitting and/or adjustment which they never performed.  By way of example and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of claims in which Sonayan, through the Retailers, billed for expensive supports and/or braces that required fittings and adjustments which they never performed.

149.    Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiff well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiff's expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## FEE SCHEDULE SCHEME TO DEFRAUD

**1.     Fraudulent Billing for Custom Fit DME and/or Orthotic Devices.**

150.    The term "custom fitted" or "custom fit" as used in HCPCS Level II, created by Centers for Medicare and Medicaid Services ("CMS") and the source of all codes used to bill for DME contained in the Fee Schedule, refers to expensive pre-fabricated DME and/or orthotic devices that requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e. the item must be  trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment, and the fitting does require expertise of a certified orthotist or an individual who has specialized training in the provision of orthosis to fit the item to the individual beneficiary. "Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces)—Correct Coding—Revised," Palmetto GBA (CMS's Pricing, Data Analysis and Coding Contractor) (March 12, 2021), https://www.dmepdac.com/palmetto/PDACv2.nsf/DIDC/3HJFX8TFDH~Articles%20and%20Pu blications~Advisory%20Articles; *accord* Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines," New York State Department of Health (March 1, 2019).

151.    Retailer Defendants routinely submitted fraudulent bills in support of expensive pre-fabricated orthotic devices that either required a fitting and adjustment that was not provided as billed and/or never performed.

152.    In furtherance of the scheme to defraud, the Retailers routinely include measurement sheets with the bills submitted to Plaintiff in an effort to create the illusion that a customized fitting was conducted for the Covered Person in connection with providing the orthotic device.

153.    The measurements were, in many cases, never performed and/or unnecessary as the fitting required under the Fee Schedule code was never performed.

154.    The Retailers created and included the measurement sheets with their bill submissions for the purpose of creating a fraudulent justification for billing under Fee Schedule codes with expensive reimbursement rates when, in fact, the requirements for reimbursement under such codes were never met.

155.    MedMart of NY and Royal Rehab routinely bill under codes requiring a customized fitting, but never perform any customization.

156.    Under the relevant Fee Schedule in existence at the time, the permissible charges for lumbosacral orthoses ("LSOs") range from $43.27, under code L0625 for basic, prefabricated LSOs provided off-the-shelf, to $1,150.00 under code L0632 for more complex LSOs that are custom fabricated.

157.    Sonayan, through the Retailers, routinely submitted bills for LSOs using codes reserved for prefabricated DME and/or orthotic devices that require a customized fitting, including, but not limited to, L0627, L0631, and/or L0637, notwithstanding that a customized fitting was never performed. Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of claims where one or more of the Retailers submitted fraudulent bills for LSOs to Plaintiff using codes L0627, L0631 and/or L0637.

158.    To the extent any DME and/or orthotic devices were provided, Sonayan, through the Retailers, provided cheap, one-size-fits-all LSOs for which no customized fitting was ever performed.

159.    Under the relevant Fee Schedule in existence at the time, the permissible charges for knee braces range from $65.00, under code L1830, for a prefabricated knee brace dispensed off-the-shelf, to $1,107.70, under code L1844, for more complex models that are custom fabricated.

160.    Sonayan, through MedMart of NY, routinely submitted bills for knee braces using codes L1820, L1832, and/or L1843 which are reserved for prefabricated DME and/or orthotic devices that require a customized fitting, which was never performed. By way of example and not limitation, Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of claims where MedMart of NY submitted fraudulent bills for knee braces to Plaintiff using codes L1820, L1832 and/or L1843.

161.    To the extent any DME and/or orthotic devices were provided, Sonayan, through MedMart of NY, provided cheap, one-size-fits-all knee braces, which were not custom made to the Covered Persons' measurements and for which no customized fitting was ever performed.

## 2.    Fraudulent Billing of Cervical Traction Units

162.    Sonayan, through the Retailers, routinely submitted fraudulent bills to Plaintiff for cervical traction units under Fee Schedule Code E0855.

163.    The cervical traction units purportedly provided by the Retailers are inexpensive replicas or knockoffs of a trademarked cervical traction units with a wholesale price that is a fraction of the cost associated with the authentic device. In that regard, to the extent anything was supplied to No-fault Covered Persons at all, the Retailers provided basic, inexpensive cervical traction units pursuant to a predetermined course of treatment, based on generic prescriptions, regardless of medical necessity and misrepresented the nature, quality, and cost of the items in each of the bills submitted to Plaintiff.

164.    In particular, the cervical traction units provided by the Retailers are replicas or "knockoffs" of the Posture Pump, which were sold and distributed to the Retailers by Comfortland Medical, Inc. ("Comfortland"), under the brand name Comfortmax Cervical Hometrac.

165.     On or about August 15, 2013, Comfortland was sued for patent infringement of the Posture Pump in the matter of *Posture Pro, Inc. v. Comfortland Medical, Inc.*, 13-cv-1252 (JVS) (AN) (hereinafter the "Comfortland Action"), for distributing a knockoff of the Posture Pump cervical traction unit under its Comfortmax Cervical Hometrac brand, which was of inferior quality to the Posture Pump model and which infringed upon the patent held by Posture Pro.

166.     The Retailers purchased the Comfortmax or a similar unit from Comfortland and continue to supply the knockoff device(s) and bill insurers, including Plaintiff.

167.     By way of example and not limitation, Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of claims submitted to Plaintiff where the above listed Retailers submitted fraudulent bills for Comfortmax cervical traction devices.

168.     To the extent the Retailers provided a cervical traction unit purportedly trademarked and/or manufactured by Posture Pro, the legitimate acquisition cost of such item is $65.00.

169.     By billing cervical traction units under code E0855, Sonayan, through the Retailers, falsely represented that they provided expensive, medically necessary cervical traction units when in actuality they provided cheap, inexpensive items that in many cases were replicas or knockoffs of trademarked items.

## MONEY LAUNDERING SCHEME

170.     Defendants knew that the money paid by insurers, in general, and Plaintiff, in particular, to the Retailers represented the proceeds and profits of their unlawful activity.

171.     To ensure that they would ultimately receive their ill-gotten gains, The Defendants engaged in a complex check cashing and/or money laundering scheme in furtherance of the scheme to defraud.

172.   These covert transactions were facilitated through various clandestine arrangements among one or more of the Retail Defendants, Wholesalers, check brokers (who acted as intermediaries between the check cashers and the Retail Defendants and one or more Wholesalers in order to conceal the true beneficiaries of the transactions) and check cashers.

173.   As described herein, on information and belief,  the Defendant Retailers and Defendant Wholesalers generated significant amounts of cash through transactions with check cashers and/or other financial arrangements.  This cash was used to facilitate, among other things: (i) the secret cash kickback arrangements between the Defendant Retailers and one or more Wholesalers that were essential to foster the illusion that the Retailers actually paid the inflated amounts for DME and/or orthotic devices reflected on the wholesale invoices; (ii) the secret cash kickback arrangements between the Defendant Retailers and No-fault Clinics, which were necessary to induce the clinics to supply the Defendant Retailers with prescriptions for bogus DME and/or orthotic devices; and (iii) the Defendant Retailers' and one or more Defendant Wholesalers' transactions, which were intentionally disguised as business expenses in order evade corporate tax liabilities through false deductions and/or the under reporting of income, thereby maximizing the Defendants' profits from, and enhancing their incentives to continue, the fraudulent activities described herein.

174.   As part of the scheme, one or more of the Defendants routinely presented numerous checks to check cashers that were structured in amounts slightly under the $10,000.00 floor that would have triggered compulsory reporting to the government.  These checks were: (i) payable to entities that maintained bank accounts, but had no apparent business or lawful purpose; (ii) payable to fictitious payees intended to conceal the true beneficiaries of the transactions; and/or (iii)

presented by "brokers" who acted as intermediaries between the check cashers, Retailers and Wholesalers in order to conceal the true beneficiaries of the transactions.

175.     On information and belief, in exchange for a nominal fee, nearly all of the cash generated by the check cashing transactions involving the Wholesalers was returned to the Retailers.  In particular, in furtherance of the scheme to defraud, to create the illusion that the Retailers paid the grossly inflated prices on the invoices provided by one or more Wholesalers, the Retailers issued checks to one or more Wholesalers, among others, for the full amounts reflected on the wholesale invoice(s).  The Retailers used those checks to demonstrate to Plaintiff, and others, that they paid the false wholesale invoice amounts and used the returned cash to pay kickbacks to, among others, the clinics that issued fraudulent and/or forged prescriptions for DME.

176.     In reality, on information and belief, one or more Wholesalers converted the checks they received from the Retailers to cash and secretly returned cash to the Retailers up to 98% of the wholesale invoice amounts.

177.     Through these transactions, the Retailers were able to surreptitiously obtain cash, which in turn would be used to, among other things, pay kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices, and to the Wholesalers in exchange for inflated wholesale invoices, thereby maintaining a symbiotic relationship necessary to facilitate the scheme to defraud.

## DISCOVERY OF THE FRAUD

178.     To induce Plaintiff to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- • Sonayan, through the Retailers, routinely and deliberately: (i) failed to submit wholesale invoices with their initial bill submissions, thereby

concealing the amounts that the Retailers actually paid for any DME and/or orthotic devices, the manufacturer, make, model, size and quality of the goods, and the actual value of the goods in a legitimate marketplace; or (ii) submitted fraudulent wholesale invoices from one or more of the Wholesalers, reflecting prices far in excess of those actually paid by the Retailers, to the extent necessary to support the fraudulent charges;

- With respect to Fee Schedule Items, Sonayan, through the Retailers, routinely misrepresented in the bills submitted to Plaintiff that they provided more expensive items from the middle or top end of the Fee Schedule, rather than the inexpensive, basic items that actually were supplied;

- Sonayan, through the Retailers, submitted false delivery receipts in support of their bills that purported to demonstrate the No-fault Covered Persons' receipt of the DME and/or orthotic devices, when, in actuality, the delivery receipts were routinely blank at the time the No-fault Covered Persons signed them;

- Sonayan, through the Retailers, systematically failed and/or refused to provide Plaintiff with a meaningful description of the DME and/or orthotic devices (*i.e.*, make and model) purportedly provided to Covered Persons, and/or additional information necessary to determine whether the charges submitted by the Retailers were legitimate.

179. Plaintiff is under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiff in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiff to justifiably rely on them. As a proximate result, Plaintiff has incurred damages of more than $121,200.00 based upon the fraudulent bill submissions.

180. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiff, Plaintiff did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS SONAYAN, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

181.    The allegations of paragraphs 1 through 180 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

182.    At all times relevant herein, MedMart of NY was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

183.    From, in or about October 9, 2013 through the date of the filing of this Complaint, Defendants Sonayan, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the MedMart of NY enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

184.    At all relevant times mentioned herein, Defendant Sonayan, together with others unknown to Plaintiff, exerted control over and directed the operations of the MedMart of NY enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff American Transit Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

49

185.   One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Sonayan required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

186.   It was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

187.   The racketeering acts set forth herein were carried out on a continued basis for more than an eight-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Sonayan, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

188.   This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as MedMart of NY continues to pursue collection on the fraudulent billing to the present day.

189.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Sonayan, with the knowledge and

intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the MedMart of NY enterprise based upon materially false and misleading information.

190.    Through the MedMart of NY enterprise, Defendant Sonayan submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Covered Persons as billed. The bills and supporting documents that were sent by Defendant Sonayan, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Sonayan, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the MedMart of NY enterprise through the filing of this Complaint.

191.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Sonayan, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

192.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

193.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

194.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit Insurance Company has been injured in its business and property and Plaintiff has been damaged in the aggregate amount presently in excess of $23,536.54, the exact amount to be determined at trial.

195.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Sonayan, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS SONAYAN, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5**

**(RICO, pursuant to 18 U.S.C. § 1962(c))**

196.    The allegations of paragraphs 1 through 180 are hereby repeated and re-alleged as though fully set forth herein.

**THE RICO ENTERPRISE**

197.    At all times relevant herein, Royal Rehab was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

198.    From, on or about April 5, 2013 through the date of the filing of this Complaint, Defendants Sonayan, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 knowingly conducted and participated in the affairs of the Royal Rehab enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix

and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

199.    At all relevant times mentioned herein, Defendant Sonayan, together with others unknown to Plaintiff, exerted control over and directed the operations of the Royal Rehab enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff American Transit Insurance Company, that were based, in part, on the utilization of fraudulent wholesale invoices.

200.    One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Sonayan required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

201.    It was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

202.    The racketeering acts set forth herein were carried out on a continued basis for more than a nine year period, were related and similar and were committed as part of the ongoing scheme

of Defendants Sonayan, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

203.     This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Royal Rehab continues to pursue collection on the fraudulent billing to the present day.

204.     As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Sonayan, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Royal Rehab enterprise based upon materially false and misleading information.

205.     Through the Royal Rehab enterprise, Defendant Sonayan submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Covered Persons as billed. The bills and supporting documents that were sent by Defendant Sonayan, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Sonayan, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Royal Rehab enterprise through the filing of this Complaint.

206.     A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Sonayan, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

207.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

208.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

209.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit Insurance Company has been injured in its business and property and Plaintiff has been damaged in the aggregate amount presently in excess of $97,700.00 the exact amount to be determined at trial.

210.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Sonayan, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANTS MEDMART OF NY, ROYAL REHAB AND SONAYAN**

**(Common Law Fraud)**

211.     The allegations of paragraphs 1 through 180 are hereby repeated and realleged as though fully set forth herein.

212.    Defendants MedMart of NY, Royal Rehab, and Sonayan made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiff American Transit Insurance Company for payment.

213.    Each and every bill and supporting documentation submitted by Defendants MedMart of NY, Royal Rehab, and Sonayan to Plaintiff set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Covered Persons. The false representations contained therein not only were intended to defraud Plaintiff but constitute a grave and serious danger to the No-fault Covered Persons and the consumer public.

214.    Defendants MedMart of NY, Royal Rehab, and Sonayan intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME and/or orthotic devices purportedly supplied to No-fault Covered Persons;

- False and misleading statements as to the amounts MedMart of NY and Royal Rehab were entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiff that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Covered Persons;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Covered Persons, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a)  DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Sonayan, through MedMart of NY and/or Royal Rehab, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to

direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the applicable Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Sonayan, through MedMart of NY and/or Royal Rehab, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

215.    The foregoing was intended to deceive and mislead Plaintiff into paying Defendants MedMart of NY's and Royal Rehab's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

216.    Defendants MedMart of NY, Royal Rehab, and Sonayan knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff to rely thereon.

217.    Plaintiff did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiff were led to believe existed as a result of the acts of fraud and deception of Defendants MedMart of NY, Royal Rehab, and Sonayan.

218.    Had Plaintiff known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid the Defendants MedMart of NY's and Royal Rehab's claims for No-fault insurance benefits submitted in connection therewith.

219.    Furthermore, the far-reaching pattern of fraudulent conduct by Defendants MedMart of NY, Royal Rehab, and Sonayan evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiff to recovery of exemplary and punitive damages.

220.    By reason of the foregoing, Plaintiff American Transit Insurance Company has sustained compensatory damages and has injured in its business and property in an amount yet to

be determined, but believed to be in excess of $121,200.00, the exact amount to be determined at

trial, plus interest, costs, punitive damages, and other relief the Court deems just.

### FOURTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS MEDMART OF NY, ROYAL REHAB, AND SONAYAN

### (Unjust Enrichment)

221.    The allegations of paragraphs 1 through 180 are hereby repeated and realleged as

though fully set forth herein.

222.    By reason of their wrongdoing, Defendants MedMart of NY, Royal Rehab, and

Sonayan have been unjustly enriched, in that they have, directly and/or indirectly, received moneys

from Plaintiff American Transit Insurance Company that are the result of unlawful conduct and

that, in equity and good conscience, they should not be permitted to keep.

223.    Plaintiff is therefore entitled to restitution from Defendants MedMart of NY, Royal

Rehab, and Sonayan in the amount by which it has been unjustly enriched.

224.    By reason of the foregoing, Plaintiff American Transit Insurance Company has

sustained compensatory damages and has been injured in its business and property in an amount

yet to be determined, but believed to be in excess of $121,200.00, the exact amount to be

determined at trial, plus interest, costs, and other relief the Court deems just.

### FIFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 5 AND
### JOHN DOES 1 THROUGH 5

### (Aiding and Abetting)

225.    The allegations of paragraphs 1 through 180 are hereby repeated and realleged as

though fully set forth herein.

226. The Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiff American Transit Insurance Company by Defendants MedMart of NY, Royal Rehab, and Sonayan.

227. The acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants MedMart of NY, Royal Rehab, and Sonayan purportedly provided to No-fault Covered Persons; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants MedMart of NY, Royal Rehab, and Sonayan could mail fraudulent bills to Plaintiff and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Sonayan, through MedMart of NY and/or Royal Rehab, to MedMart of NY and/or Royal Rehab to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiff, among others, through MedMart of NY and/or Royal Rehab; and (v) knowingly supporting the negotiation and performance of kickback agreements between Sonayan, through MedMart of NY, and/or Royal Rehab, and the No-fault Clinics.

228. The conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent

scheme because without their actions, there would be no opportunity for Defendants MedMart of NY, Royal Rehab, and Sonayan to obtain fraudulently inflated payments from Plaintiff, among others.

229.    The Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiff into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

230.    The conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) caused Plaintiff American Transit Insurance Company to pay money based upon the fraudulent charges submitted through MedMart of NY and Royal Rehab in an amount to be determined at trial, but in no event less than $121,200.00.

231.    The Wholesale Defendants' (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiff to recover punitive damages.

232.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages, plus interest, costs, and other relief the Court deems just.

## SIXTH CLAIM FOR RELIEF

## AGAINST ALL RETAIL DEFENDANTS

### (Declaratory Judgment under 28 U.S.C. § 2201)

233.    The allegations of paragraphs 1 through 180 are hereby repeated and realleged as though fully set forth herein.

234.     At all relevant times mentioned herein, each and every bill mailed by Sonayan, through the Retailers, to Plaintiff sought reimbursement in excess of the amounts authorized by the No-fault Law and applicable Fee Schedule by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the billed for DME and/or orthotic devices.

235.     To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which the Retailers' wholesale cost was a mere fraction of the amount they charged Plaintiff and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

236.     At all times relevant herein, the Retail Defendants exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiff, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule purportedly provided to Covered Persons.

237.     In view of the Retail Defendants' submission of fraudulent bills to Plaintiff, Plaintiff contends that the Retail Defendants have no right to receive payment for any pending bills they have submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiff;

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME and/or orthotic devices that they never supplied to No-fault Covered Persons.

238.     As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME and/or orthotic devices purportedly supplied to No-fault Covered Persons and the amounts they were entitled to be reimbursed, which they never supplied to No-fault Covered Persons, in order to manipulate the payment formulas under the No-fault Law and applicable Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiff, therefore, are under no obligation to pay any of Retail Defendants' No-fault claims.

239.     Plaintiff has no adequate remedy at law.

240.     The Retail Defendants will continue to bill Plaintiff for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiff has no obligation to pay the pending, previously denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE,** Plaintiff demands judgment as follows:

i)     Compensatory damages in an amount in excess of $121,200.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)     Treble damages, costs, and reasonable attorneys' fees on the First and Second Claims for Relief, together with prejudgment interest;

iv)     Compensatory and punitive damages on Third Claim for Relief, together with prejudgment interest;

v)      Compensatory damages on the Fourth Claim for Relief, together with prejudgment interest;

vi)      Compensatory and punitive damages on the Fifth Claim for Relief, together with prejudgment interest;

vii)      Declaratory relief on the Sixth Claim for Relief, declaring that Plaintiff has no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff about the DME and/or orthotic devices purportedly supplied to No-fault Covered Persons and the amounts they were entitled to be reimbursed in order to manipulate the payment formulas under the No-fault Law and applicable Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiff; and (2) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff about the DME and/or orthotic devices purportedly supplied to No-fault Covered Persons by submitting claims for DME and/or orthotic devices that they never supplied to No-fault Covered Persons; and

viii)      Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated:  New York, New York,
            October 28, 2022

<strong>MORRISON MAHONEY LLP</strong>

By: _/s/ Lee Pinzow_____
    Robert A. Stern, Esq.
    James McKenney, Esq.
    Lee Pinzow, Esq.
    Attorneys for Plaintiff
    Wall Street Plaza
    88 Pine Street, Suite 1900
    New York, New York 10005
    (212) 825-1212

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN TRANSIT INSURANCE COMPANY,<br><br>                                    **Plaintiff,**<br><br>    -against-<br><br>MEDMART OF NY CORP, ROYAL REHAB INC, GIKOR SONAYAN A/K/A GEORGE SMITH, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                                   **Defendants.** | CIVIL ACTION<br><br>22-CV-6581<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

# COMPLAINT

MORRISON MAHONEY, LLP
ATTORNEYS FOR PLAINTIFF
WALL STREET PLAZA
88 PINE STREET, SUITE 1900
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 825-1212